IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| v. | : | Case No.  SAG-21-391 |
| | : | |
| **DAVON JOHNSON,** | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

The defense writes to address the government's recommendation of 45-months imprisonment or, in the alternative, time served with 27 months of home detention.  Furthermore, the defense provides a detailed written response to the government's arguments as to whether Mr. Johnson faces a base offense level of 14 or 20 to obviate the need for oral argument on the issue at the sentencing hearing Thursday.

    **I.**    **The government's sentencing recommendations are inefficient and wasteful.**

The government recognizes that "[t]his sentencing is especially difficult" because of "the dichotomy between Davon Johnson as he was in the years before and on March 29, 2021[,] and Davon Johnson as he has been since his release from pretrial detention."  ECF No. 147 at 1-2.  In recognition of "the challenge of resolving that dichotomy," the government asks the Court to impose a sentence of 45-months imprisonment or, in the alternative, time served with 27-months of home detention as a condition of supervised release.  *Id.* at 2, 24.  While the defense appreciates that the government has attempted a nuanced approach in its sentencing recommendation, both of the government's proposals waste scare resources—either of the Bureau of Prisons or the U.S. Probation Office—and would interfere, if not destroy, the incredible progress that Mr. Johnson has

made "from his own efforts and from the truly outstanding support, assistance, and representation he has received from" the Office of the Federal Public Defender, particularly, staff investigator Justin Thompson.

Because Mr. Johnson has already served 18 months in pretrial detention, after good-time credit, the 45-month sentence requested by the government would amount to a 20 month and one week sentence.  Earned Time Credits authorized by the First Step Act and halfway-house placement emphasized by the Second Chances Act could very well mean that Mr. Johnson would spend less than 20 months in custody.  But to what end?

First, were he to receive a 45-month—or shorter—period of incarceration, Mr. Johnson would lose the job he excels at and where he is in line for a promotion.  Once released, he would have to start all over again, praying that Home Chef has another opening on its sanitation crew around the time he is released from custody.  Second, he would not be able to continue to pursue vocational programming during the day while working nights.  The Bureau of Prisons has long waiting lists for vocational programming, and with a sentence of 20 months or less, Mr. Johnson would get little vocational training while in custody.  Third, prisons are anti-social environments. Those in confinement must develop a survival mentality, always on guard for those who might prey on them.  This is particularly true for someone like Mr. Johnson who stands only 5'5" tall and weighs 135 pounds and has never been in the Bureau of Prisons.  Mr. Johnson has spent the past 19 months since his release from pretrial detention focused on developing and maintaining what he calls a mindset to "elevate" himself.  It would be a tragedy to put Mr. Johnson in an environment where he'd be forced to focus on survival rather than "elevating."  Fourth, Mr. Johnson would be taken away from his now-6 year-old daughter.  Incarcerating Mr. Johnson now

would prevent him from being an active father, financially providing for his daughter, and obtaining joint custody.

Moreover, incarcerating an individual who has lived successfully in the community for 19 months—without any new offenses—is unnecessary to protect the public and a wasteful use of Bureau of Prisons resources. Prison is not necessary to protect the public; nor is it necessary to provide Mr. Johnson with rehabilitative programming given that he has been actively pursuing vocational training in the community. It is also not necessary to punish Mr. Johnson further, as he has already been punished by 18 months of pretrial detention and an additional 17 months of home detention/home confinement—totaling just under three years.

In its analysis of the nature and seriousness of the offense, the government appropriately discusses the impact that offenses like this have on the broader community and for the people who live on Richwood Avenue where it occurred. ECF No. 147 at 18-19. But the government is wrong to assert that the defense is focusing on Mr. Johnson's accomplishments to the exclusion of "the seriousness of the offense, the need to send a reasonable message of general deterrence, the need to promote respect for the law, to provide just punishment, or (arguably in this case) the need to avoid unwarranted disparities with similarly situated defendants." *Id.* at 22. To the contrary, the defense is taking a wholistic approach to concepts of protecting the community, just punishment and promoting respect for the law—similar to how diversionary courts operate in some federal courthouses. The very community that the U.S. Attorney's Office is sworn to protect is better served when individuals like Mr. Johnson become productive members of their communities— working, taking care of their children, and using their income to invest in their communities. Isn't that, at its core, the fundamental goal of our legal system? The intervention of the federal court system has placed Mr. Johnson on the path that is best for the community. It compounds

Baltimore's problems when those who are productive members of the community are placed into the anti-social environment of prison and have to return to the community with a survival mindset, no job, and a hard-road to reestablish themselves.

No doubt general deterrence is of concern to the Court, but a time served sentence in this case sends a strong deterrent message. First, Mr. Johnson's case was prosecuted federally although it is little different than many similar fact patterns that remain in state court. Second, the U.S. Attorney's Office refused to dismiss the case even after the arresting officer, whose observations were essential to whether the stop violated the Fourth Amendment, was arrested, convicted of second-degree assault, and terminated from the police force. Third, Mr. Johnson spent 18 months in pretrial custody before being released. He then spent 17 months on home confinement or home detention. Because he did not begin working until the very end of November 2023, that meant he was restricted to his sister's modest home with few authorized opportunities to leave for almost 15 months. And, as explained by Mr. Thompson's memo to the Court, that time was truly punishing. For much of it, Mr. Johnson was literally starving. The long history of this case sends a strong deterrent message to others, but it also incentivizes the type of hard work that Mr. Johnson has done to obtain and maintain employment and vocational skills as well as avoiding criminal activity.

The government argues that the Court should consider the need to avoid unwarranted disparity but doesn't factor into that analysis just how *sui generis* this case really is. It is the rare case where someone is released after 18 months in pretrial custody and then has another 18 months in the community while the parties litigate over the import of the arrest, conviction and termination of the lead officer in the case. Mr. Johnson's record is also unusual. He has only one prior distribution-type conviction and one firearm possession—both from 2011 (more than 10 years before his arrest for the instant offense). The government has "substantial concern" about Mr.

Johnson's most recent conviction—for indecent exposure. But the statement of probable cause depicts an adolescent prank: exposing himself to those on the street while he was within a vehicle. Like much of Mr. Johnson's prior record, the conviction is consistent with a man who had not grown up. As the government correctly acknowledges, Mr. Johnson has changed and it is appropriate for the sentence to reflect that.

The government also raises the concern that this case may serve as a precedent for others. But, again, that discredits the ability of jurists to recognize that they must sentence the defendant before them and to discern how *sui generis* this case is.

In recognition of the persuasiveness of the argument for time served in this unusual case, the government has asked, in the alternative, for 27 months of home detention. While we appreciate the government contemplating no further incarceration, 27 months of home detention would be wasteful and counter-productive. First, location-monitored home detention puts a significant burden on the U.S. Probation Office. Second, given that Mr. Johnson already spent 17 months on location monitoring before it was removed in February 2024, it would be deeply wasteful and inefficient to put him back on location monitoring when it was deemed unnecessary. Third, the reason it was removed was because engaging in the number of hours of productive activities that Mr. Johnson aspired to each day is incompatible with location monitoring. At this point, additional location monitoring would interfere with Mr. Johnson's ability to both work and pursue vocational programs to enhance his skills or to hold two jobs.

In this truly unique situation, a time served sentence with a term of supervised release but no additional location monitoring is the sentence that best balances the 18 U.S.C. § 3553(a) factors. Contrary to the view of the government, it does not just reward Mr. Johnson; it is what is best for our community at large. The intervention of the federal court system provided the structure and

resources for Mr. Johnson to change his life.  It would be deeply wasteful to interfere with that now.

## II.     Mr. Johnson should have a base offense level of 14 rather than 20.

The defense agrees with "[t]he government's doubts that this is a case that will turn (or should turn) on the technical minutiae of the guidelines." ECF No. 147 at 4.  While we agree that "[t]he question of ioflupane in particular seems to have little to do with what the sentence finally should be" in this matter, ECF No. 147 at 4, it is an issue that has been hotly contested in courtrooms throughout this District.  Because the parties both acknowledge that a variance from the guidelines is appropriate in this case, it does not seem productive to dedicate a significant portion of the sentencing proceeding on Thursday to whether Mr. Johnson's base offense level should be a 14 or 20.  However, so that the Court has both parties' positions clearly articulated in writing so the Court can rule on the papers without argument, the defense files this response to the government's arguments on this issue.  The second guidelines dispute—as to whether the firearm was possessed in connection with another felony offense—is highly fact specific for the reasons set forth in the defense sentencing memo.  But the first guidelines dispute is not fact-specific but rather evidences a legal dispute between the parties as to the methodology for determining what constitutes a "controlled substance offense."

The government contends that Mr. Johnson's 2011 Maryland conviction for possession with intent to distribute cocaine (PWID), PSR ¶ 35, qualifies as a "controlled substance offense" under United States Sentencing Guidelines (U.S.S.G.) § 4B1.2(b), and thereby, serves to enhance his advisory sentencing guidelines range under U.S.S.G. § 2K2.1(a)(2).  In so arguing, the government asks this Court to ignore Fourth Circuit law, which necessarily dictates the opposite. Indeed, Fourth Circuit precedent compels a finding that Mr. Johnson's prior PWID cocaine

conviction is not a § 4B1.2(b) "controlled substance offense." Specifically, Mr. Johnson's 2011 Maryland conviction for PWID cocaine is not a "controlled substance offense" because a categorical mismatch exists between the Maryland cocaine definition (as it existed in 2011) and the current Maryland cocaine definition (as it exists today).

In *United States v. Duckett,* Case No. PWG-19-0229 (D. Md. Sept. 28, 2022), Judge Grimm found the same with respect to a prior Maryland cocaine conviction when there was a mismatch between the old cocaine definition (as it existed under Maryland state law at the time of the prior conviction) and the current cocaine definition (as it existed under Maryland law at the time of the federal sentencing). Adhering to Fourth Circuit law, in *Duckett*, Judge Grimm rejected the identical arguments the government makes here and correctly held that such conviction does not qualify as a § 4B1.2(b) "controlled substance offense." Likewise, Judge Russell did the same in *United States v. Murdock*, GLR-22-0033 (D. Md. Sept. 15, 2023). And Judge Volk recently joined Judges Grimm and Russell in holding the same in *United States v. Hughes,* 2024 WL 1717750, at *5 (S. D. W. Va. Jan. 16, 2024). In accord with *Duckett*, *Murdock*, and *Hughes*, this Court must find that Mr. Johnson's 2011 Maryland PWID cocaine conviction fails to qualify as a § 4B1.2(b) "controlled substance offense."

The government does not dispute that a mismatch exists between the 2011 Maryland cocaine definition (which included ioflupane) and the current Maryland cocaine definition[1] (which excludes ioflupane). Nonetheless, the government asks this Court to abandon the categorical approach altogether and instead adopt a novel approach under which every state statute that ever criminalized a drug once *upon a time* qualifies as a § 4B1.2(b) "controlled substance offense," even if the state has now decriminalized a drug. In other words, under the government's approach,

---

[1] The current Maryland definition of cocaine tracks the federal Controlled Substances Act (CSA), 21 U.S.C. § 812. *See* Md. Code, Crim. Law § 5-403(a)(2) (2022).

7

one can get a draconian increase in his sentence based on an outdated state law—one that does not match the current state law or anything at all. The categorical approach requires "compar[ing] the elements of the crime of conviction" to something else. *Descamps v. United States*, 570 U.S. 254, 257 (2013). As Judge Grimm explained in *Duckett*, the government's "no comparison" approach, which requires a court to find that every drug ever regulated by a state is a § 4B1.2(b) "controlled substance offense"—without comparing it to the current law or anything else—defies the categorical approach.

Also, as Judge Grimm elaborated, the government's approach conflicts with the Fourth Circuit's decision in *United States v. Hope*, 28 F.4th 487, 504-05 (4th Cir. 2022). The Court's reasoning in that case necessarily dictates that a substance which is no longer criminalized by the state at the time of the federal sentencing is not a § 4B1.2(b) "controlled substance offense." Although *Hope* involved the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), the Fourth Circuit embraced and relied on the reasoning of the Ninth Circuit's decision in *United States v. Bautista*, 989 F.3d 698, 703 (9th Cir. 2021)—a § 4B1.2(b) guidelines case—to find that the *old law* (at the time of the prior conviction) must match the *current law* (at the time of the federal sentencing) in order to qualify the prior conviction as an ACCA "serious drug offense." In so doing, the Court made clear that the same old law/current law comparison applies to the guidelines (with the only difference for § 4B1.2(b) being that the old state law has to match the current state law (rather than current federal law required under the ACCA)).

Under this framework, Mr. Johnson's 2011 cocaine conviction is not a § 4B1.2(b) "controlled substance offense" because the old Maryland definition of cocaine (which included ioflupane) fails to match the current Maryland definition of cocaine (which excludes ioflupane).

    **A.**    ***United States v. Hope* requires a two-step approach under which a sentencing court must compare the old state law (as it existed at the**

> **time of the prior conviction) to the current state law (as it exists at the time of the federal sentencing) to determine whether a prior conviction is a § 4B1.2(b) "controlled substance offense."**

In *Hope,* 28 F.4th at 504-05, the Fourth Circuit held that in determining whether a prior state drug conviction qualifies as a "serious drug offense" under the ACCA, the sentencing court must compare the *old* definition of the state drug (as it existed at the time of the prior conviction) to the *current* definition of the drug (determined by the federal Controlled Substances Act ("CSA") incorporated into the "serious drug offense" definition) as it exists at the time of the federal sentencing. After doing this comparison, if the *old* state definition criminalizes a substance that the *current* federal definition does not, then the prior conviction categorically fails to qualify as a "serious drug offense" under the ACCA.

The *Hope* analysis consists of two steps. In step one, the sentencing court must determine the definition of the drug as it existed at the time of the prior conviction. As the Court explained in *Hope,* 28 F.4th at 505, this rule comes from the Supreme Court's decision in *McNeill v. United States,* 563 U.S. 816 (2011). In that case, at issue was whether a prior conviction qualified as an ACCA "serious violent felony." The Supreme Court held that at step one of the analysis, a sentencing court must look to the law of the state as it existed at the time of the prior conviction to determine the legal basis for the conviction. *Id.* at 820-25. The Court reasoned that because prior convictions "have already occurred," the "only way to answer this backward-looking question is to consult the law that applied at the time of that conviction"—rather than a change in the law that occurred after-the-fact. *Id*. at 820.

However, in *Hope*, 28 F.4th at 505-05, the Fourth Circuit held that this *McNeill* rule does not apply to step two: determining the timing of the law that applies to the comparator.[2] Rather,

---

[2] *McNeill* says nothing about whether, at the second step, the criteria for determining if a "previous conviction" is an ACCA "serious drug offense" or a § 4B1.2(b) "controlled substance

9

under step two, the Fourth Circuit held that a sentencing court must look to the *current law* in defining the comparator (which under the ACCA is the "serious drug offense definition" determined by the CSA). *Id.* If that current law is a mismatch with the old state law that existed at the time of the prior conviction, the inquiry ends, and the prior conviction is not an ACCA predicate. *Id.* In holding as such and rejecting the government's argument that the *McNeill* rule applies to the federal comparator, the Fourth Circuit embraced the reasoning of the Ninth Circuit in *Bautista*, 989 F.3d at 703 (a § 4B1.2(b) guidelines case) that "it would be illogical to conclude that federal sentencing law attaches 'culpability and dangerousness' to an act that Congress has concluded is *not* culpable and dangerous." *Hope*, 28 F.4th at 505 (quoting *Bautista*, 989 F.3d at 703). In other words, if Congress has said that a drug is no longer dangerous by decriminalizing it, then Congress has also said that a defendant's prior state conviction based on that drug should no longer serve as a basis for an increase in a defendant's federal sentence. Therefore, this current-law rule (sometimes referred to as the "time-of-sentencing rule") makes great sense in defining the comparator.

The government's only response to *Hope* is that it involved an ACCA case in which the "serious drug offense" is defined by the federal drug schedules under the CSA, whereas the § 4B1.2(b) "controlled substance offense" definition (as required by the Fourth Circuit's decision in *United States v. Ward*, 972 F.3d 364, 371 (4th Cir. 2020)) is determined by "state law." ECF No. 147 at 5. But this distinction has nothing to do with the *current-law* holding of *Hope*. *Ward* never addressed the question of whether the current-law rule applies in defining the comparator. *Id*. That issue is not one that was briefed, analyzed, or decided. In *Ward*, at issue was whether a prior

---

offense" are "locked in at the time of the conviction" or whether current law applies. *United States v. Abdulzaiz,* 998 F.3d 519, 526 (2021). Therefore, *McNeill* does not displace the categorical approach. Rather, it only provides guidance on how to carry out one step of that approach.

10

Virginia drug conviction qualified as a § 4B1.2(b) "controlled substance offense."  972 F.3d at 371-75.  However, the Court never compared the old Virginia law as it existed at the time of the prior conviction to the current Virginia law at time of federal sentencing because the parties never argued that the Virginia law had changed between the time of prior conviction and the federal sentencing.  *Id.*  It was simply not a question before the Court.³  Therefore, *Ward* did not decide the current-law issue, but *Hope* did, 28 F.4th at 504.  Thus, this Court is bound by Hope's *current-law* rule.

Indeed, *Hope* tells us that whether the comparator is defined by the federal CSA (ACCA) or state law (§ 4B1.2(b)), it is determined by looking to *current* law.  *Hope*'s current-law ruling is not limited to the ACCA, but also applies to the guidelines because the Fourth Circuit relied on the reasoning of a guidelines case (*Bautista*, 989 F.3d at 703) to hold that the current-law "time-of-sentencing" rule applies to the ACCA.  *Hope*, 28 F.4th at 505; *see also Payne v. Tuslini*, 998 F.3d 648, 655 (4th Cir. 2021) ("If necessary to the outcome, a precedent's reasoning must be followed[.]").  Furthermore, in *Hope*, the Fourth Circuit also relied on 18 U.S.C. § 3553(a)(4)(A)(ii) and U.S.S.G. § 1B1.11 (which require the district court to use the "guidelines that are in effect on the date that the defendant is sentenced") to hold that the current-law "time-of-sentencing" rule applies to the ACCA.  28 F.4th at 505-08.

The government counters that these provisions are satisfied under its time-of-prior conviction rule because an outdated version of how a drug was previously defined by state law is what defines a "controlled substance offense" under the current § 4B1.2(b) guideline.  But that is not how the Fourth Circuit interpreted §§ 1B1.11 and 3553(a)(4)(A)(ii).  In *Hope,* the Fourth

---

³ The same was true in *United States v. Ruth*, 966 F.3d 642, 654 (7th Cir. 2020) (holding 2016 cocaine conviction was a § 4B1.2(b) "controlled substance offense" without comparing past and present drug schedules because the parties never argued that the schedules changed between the time of the prior conviction and sentencing; the issue was never briefed, analyzed or decided).

Circuit interpreted these provisions to mean that the current-law time-of-sentencing rule applies. It makes no sense that this rule (that *Hope* lifted from the guidelines) would not apply to the guidelines themselves in defining the § 4B1.2 "controlled substance offense" comparator.

And there is no good policy reason why the current-law logic of *Hope* should not equally apply to § 4B1.2(b). If the old state law (as it existed at the time of the prior conviction) included a substance that has now been decriminalized under the current state law, then that means the state no longer considers it a culpable and dangerous drug, and in turn, it is not a § 4B1.2(b) "controlled substance offense" that should increase one's federal sentence. But if the sentencing court looks only to state law from the time of the prior conviction, a defendant could be subject to a multi-year enhancement for something the state has since concluded is not culpable and dangerous. That is particularly troubling, given the extremely harsh penalties that result from predicate-offense enhancements. As discussed above, in *Hope*, 28 F.4th at 505, the Fourth Circuit leaned on this same policy reason to establish the time-of-sentencing rule with respect to the ACCA. No reason exists why the same should not apply here.

Nonetheless, the government persists that *Bautista*, 989 F.3d at 703—upon which the Fourth Circuit relied in *Hope*—conflicts with *Ward*, 972 F.3d at 371, because in *Bautista*, the Ninth Circuit held that the § 4B1.2(b) "controlled substance offense" comparator is defined by the federal schedules, whereas in *Ward*, the Fourth Circuit held that the same comparator is defined by state law. But again, this distinction says nothing about the current-law rule and which version of the state law (old or current) applies in determining whether a prior state conviction qualifies as a "controlled substance offense." As explained above, the Fourth Circuit in *Hope*, 28 F.4th at 505, adopted *Bautista's* current-law rule (in accord with the First Circuit in *United States v. Abdulaziz,* 998 F.3d 519, 531 (1st Cir. 2021), and the Second Circuit in *United States v. Gibson,* 55 F.4th 153

(2d Cir. 2022)) to define the comparator, and in so doing, effectively made clear that this rule applies whether the comparator is an ACCA "serious drug offense" or a § 4B1.2(b) "controlled substance offense."

> **B.  The basics of the categorical approach require this Court to apply the *Hope* framework to § 4B1.2(b).**

Moreover, the government's word games don't work.  The government calls the approach set forth in *Hope* "double-look-matching."  ECF No. 147 at 9.  The government can call the approach whatever it wants, but it does not change the reality that the *Hope* framework controls here.  In fact, the approach the government is advocating is the "no comparison" approach, which not only conflicts with *Hope,* but also eviscerates the basics of the categorical approach.  "[T]he categorical approach demands . . . compar[ing] the elements of the crime of conviction" to something else. *Descamps,* 570 U.S. at 257.  But looking only to state law from the time of the predicate conviction does not involve any categorical comparison because the sentencing court would effectively be comparing the defendant's prior conviction against *itself.*  Under the government's no-comparison approach, any conviction under any state controlled-substance law (outdated or not) will always equal a § 4B1.2(b) "controlled substance offense."  In contrast, looking to the state law at the time of the federal sentencing provides a consistent standard against which to compare every individual prior state conviction.

Additionally, looking to the definition of "controlled substance" at the time of the federal sentencing also matches how courts perform other predicate-offense analyses.  When determining whether a prior conviction is a "crime of violence" under the guidelines, courts compare the prior conviction to the definition of that term as of sentencing—not the definition from the time of the defendant's state conviction.  *See United States v. Green*, 996 F.3d 176, 182 (4th Cir. 2021) (comparing the Hobbs Act robbery definition to the current § 4B1.2 "crime of violence" definition

13

to find that it is not a "crime of violence"). The same is true when determining whether a state offense prohibits the type of conduct necessary to qualify as a "controlled substance offense." *See United States v. Campbell,* 22 F.4th 438, 441-42, 449 (4th Cir. 2022) (comparing the West Virginia definition of "delivery" (which criminalizes "attempted transfer" of drugs) to the current § 4B1.2(b) "controlled substance offense" definition that existed at time of the federal sentencing (which excluded inchoate offenses)).

### C.     The decisions of the Sixth and Eighth Circuits conflict with *Hope*, which is binding precedent in the Fourth Circuit.

Undeterred, the government leans on the Sixth Circuit's decision in *United States v. Clark*, 46 F.4th 404 (6th Cir. 2022), which rejected the current-law approach in the context of the § 4B1.2(b) "controlled substance offense" definition. ECF No. 147 at 10. But *Clark* is of no help to the government because it is in direct conflict with the Fourth Circuit's decision in *Hope*, 28 F.4th at 505, and, of course, this Court must follow Fourth Circuit precedent. In fact, the Sixth Circuit itself explicitly noted this conflict and explained that it was straying from *Hope*'s "time-of-sentencing rule" (*i.e.,* current-law approach) and instead applying the *McNeill* rule to the § 4B1.2 "controlled substance offense" comparator. *Clark,* 46 F.4th at 413-14. In so doing, the Sixth Circuit effectively recognized that in the Fourth Circuit, *Hope*'s current-law rule not only applies to the ACCA "serious drug offense" comparator, but also to the § 4B1.2(b) "controlled substance offense" comparator.

The Eighth Circuit's decisions in *United States v. Bailey*, 37 F.4th 467 (8th Cir. 2022), and *United States v. Altman*, 2022 WL 2965996 (8th Cir. 2022), which the government also cites, ECF No. 147 at 10, also conflict with *Hope* and have no persuasive value. These decisions summarily rejected the current-law approach for § 4B1.2(b) based on a single reason: the "controlled substance offense" definition is not defined by the federal Controlled Substances Act (CSA).

14

*Bailey,* 37 F.4th at 469; *Altman*, 2022 WL 2965996 (adopting reasoning of Bailey). But as previously explained, this distinction has no relevance to the timing current-law question resolved by *Hope*. *Hope* controls here—not *Clark, Bailey,* or *Altman.*

> **D. The government's doomsday claims regarding *Hope*'s impact are unpersuasive.**

The government continues with a sky-is-falling argument. It claims that applying *Hope*'s current-law approach would lead to the demise of any § 4B1.2 "controlled substance offense" enhancement. *See* ECF No. 147 at 11. The same argument could be made with respect to the ACCA "serious drug offense" definition. Yet, the Fourth Circuit still adopted the current-law approach in *Hope*, 28 F.4th at 505. In any event, the government's fear is exaggerated. Offenses will still qualify as "controlled substance offenses" when there has been no change in the state drug law between the time of the prior conviction and federal sentencing. Moreover, it is important to note that the Fourth Circuit has broadly disqualified an even wider swath of drug priors as § 4B1.2(b) "controlled substance offenses," despite the government's doomsday arguments, because that is what the law required. For example, in *United States v. Norman,* 935 F.3d 232, 239 (4th Cir. 2019), the Fourth Circuit, in a sweeping decision, broadly held that no federal drug conspiracy under 21 U.S.C. § 846 or any other non-generic conspiracy (state or federal) qualifies as a § 4B1.2(b) "controlled substance offense."

Likewise, in *Duckett*, *Murdock*, and *Hughes*, Judges Grimm, Russell, and Volk were not deterred by the government's arguments about the perceived impact of applying *Hope*'s current-law approach. This Court should not be either. The Court is bound by the law, regardless of the consequences.

15

### E. The government's attempts to qualify defendants for criminal sentencing enhancements based on civil regulations is absurd.

Further, the government argues that even if this Court applies *Hope*'s time-of-sentencing approach (as it must) and looks at the current state law to define the comparator, Mr. Johnson's 2011 conviction still qualifies as a § 4B1.2(b) "controlled substance offense" because although ioflupane has been decriminalized under Maryland law, it is still a substance that is subject to civil regulations. ECF No. 147 at 12. This cannot be right. Raw milk, alcohol, and tobacco products are also regulated outside the criminal justice system. But surely such civil regulations cannot be a basis for criminal liability—let alone a draconian increase in a criminal sentence. The opposite conclusion would lead to absurd results.

### F. The Fourth Circuit's decision in *United States v. Johnson* is inapposite here.

The government asserts that the Fourth Circuit's decision in *United States v. Johnson*, 945 F.3d 174, 183 (4th Cir. 2019), defeats Davon Johnson's argument. But it does no such thing. In *Johnson*, the defendant argued that a Maryland PWID fails to qualify as a "controlled substance offense" because it can be committed by offering to sell drugs. *Id.* The Fourth Circuit rejected that argument. *Id.* However, the Fourth Circuit never even mentioned the ioflupane cocaine issue. That issue was not briefed, addressed, or decided. Therefore, *Johnson* is irrelevant. The Fourth Circuit's binding decision in *United States v. Norman*, 935 F.3d at 239-40—to which the government refuses to adhere—compels this conclusion. Indeed, in *Norman*, the Fourth Circuit made explicit that a decision has no effect on an issue that was "never squarely addressed" by the Court. *Id.* at 240.

The Fourth Circuit repeated the same in *Campbell*, 22 F.4th 438. In that case, the Court held that a West Virginia delivery statute which criminalized an attempt categorically failed to

16

qualify as a "controlled substance offense" because the inclusion of attempts in § 4B1.2's commentary conflicts with the text of § 4B1.2(b)'s "controlled substance offense" definition (which only lists completed offenses—not inchoate offenses).[4] In so doing, the Fourth Circuit rejected the government's argument that it was bound by *United States v. Dozier*, 848 F.3d 180 (4th Cir. 2017), in which the Court previously ruled that a West Virginia attempt qualified as a § 4B1.2(b) "controlled substance offense." The Fourth Circuit held that *Dozier* did not control because it never addressed or decided the commentary-conflicts-with-the-text issue. *Campbell*, 22 F.4th at 447.

Likewise, because the Fourth Circuit's previous decision in *Johnson* did not address or decide the cocaine ioflupane issue, it has zero impact here. In arguing otherwise, the government has a deep misunderstanding of what constitutes controlling precedent and what does not. Even more troubling, it wants to silence defendants from making new arguments as the law evolves. *See* ECF No. 147 at 5. It has no power to do so. The very reason why there has been such a dramatic change in "crime of violence" and "controlled substance offense" law is because new arguments have been made and heard. Just as occurred in *Norman* and *Campbell*.

### G.  The government's criticism of *Duckett* and *Murdock* has no force.

Finally, the government attempts to diminish *Duckett* and *Murdock* do not work. ECF No. 147 at 7-9. *First*, the government asserts that it was error for Judge Grimm in *Duckett* to disregard the Fourth Circuit's decision in *Johnson*. But as discussed above, *Johnson* is irrelevant because it never said a word about the cocaine ioflupane issue.

---

[4]  Subsequent to *Campbell*, on November 1, 2023, the Sentencing Commission amended the text of § 4B1.2 to include inchoate offenses that were previously in the commentary to the guideline.

*Second*, the government contends that it was error for Judges Grimm and Russell to apply *Hope*'s current-law rule to the guidelines because it is irreconcilable with *Ward*. However, as extensively discussed above, *Ward* never spoke to the issue of whether current law applies to define "controlled substance offense" under § 4B1.2(b). Therefore, it is impossible to conclude that application of *Hope*'s current-law rule to § 4B1.2(b) contravenes *Ward*.

*Third*, the government contends that Judge Grimm erred by relying on the Ninth Circuit's guidelines' decision in *Bautista*, 989 F.3d 698 (even though the Fourth Circuit heavily relied on it in *Hope*) because that decision conflicts with the Fourth Circuit's decision in *Ward*. But in so arguing, the government confuses the relevant issue here as already explained above. In relevant part, *Bautista* held the current-law rule applies to define the § 4B1.2(b) "controlled substance offense" comparator. *Id.* Because *Ward* did not speak to this issue, there is no tension between *Bautista* and *Ward*. And importantly, *Hope*'s reliance on *Bautista*—a *guidelines* case—to establish the current-law rule in the ACCA context, only reinforces that, in the Fourth Circuit, this rule equally applies to the guidelines "controlled substance offense" definition. *Hope*, 28 F.4th at 505. Indeed, it would be strange to find that a guidelines case applies to the ACCA (as the Fourth Circuit did in *Hope*) but not to the guidelines themselves.

******

In short, the Fourth Circuit in *Hope* has already decided that the current-law approach must apply in determining whether a prior offense qualifies as a § 4B1.2(b) "controlled substance." Under this approach, the *old* Maryland definition of cocaine (as it existed at the time of Mr. Johnson's 2011 conviction) does not match the *current* Maryland definition of cocaine. Therefore, it is not a § 4B1.2(b) "controlled substance offense," so Mr. Johnson faces a base offense level of 14 not 20.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____
KATHERINE TANG NEWBERGER (#27803)
First Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax:  (410) (410) 962-3976
Email: katherine_newberger@fd.org

19